In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-3819, 12-3833 & 12-3867

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TIMOTHY S. DURHAM, JAMES F.
COCHRAN, and RICK D. SNOW,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:11CR00042 — **Jane Magnus-Stinson**, *Judge.*

ARGUED JANUARY 21, 2014 — DECIDED SEPTEMBER 4, 2014

Before KANNE and SYKES, *Circuit Judges*, and GILBERT, *District Judge.*[*]

[*] Of the Southern District of Illinois, sitting by designation.

SYKES, *Circuit Judge*. Timothy Durham, James Cochran, and Rick Snow were convicted of perpetrating a widespread financial fraud that caused more than $200 million in losses to thousands of victims, many of them elderly or living on modest incomes. After taking control of Fair Finance Company, a previously well-established and respected business, the trio quickly turned it into their personal piggy bank. They used money invested in Fair to support their lavish lifestyles and to fund loans to related parties that would never be repaid. When the company's auditors raised red flags about its financial status, the auditors were fired. When Fair experienced cash-flow problems, it misled investors and regulators so it could keep raising capital.

Eventually the scheme began to unravel. One of the company's directors, himself under investigation in a separate matter, alerted the FBI that Fair was being operated as a Ponzi scheme. After an investigation, the FBI seized Fair's computer servers and arrested Durham, Cochran, and Snow. A jury convicted them on various counts of conspiracy, securities fraud, and wire fraud.

They now appeal their convictions and sentences on several grounds. We reject all of their challenges save one. The government failed to enter into the trial record key documentary evidence supporting two counts of wire fraud against Durham. It was clearly an oversight, but the mistake leaves a crucial gap in the evidence on those counts. Accordingly, we reverse Durham's convictions on Counts 2 and 5 of the indictment and remand for resentencing without those counts

in the mix. In all other respects, we affirm the defendants' convictions and sentences.

## I. Background

Before the events in this case transpired, Fair Finance was a respectable company and had been in the business of providing financial services since the Great Depression. By the early 2000s, the company primarily focused on purchasing consumer receivables. Fair would purchase installment contracts from businesses with a single, up-front payment at a discounted rate. This arrangement provided working capital for the business and a profit for Fair—the difference between what it paid for the contract and what it ultimately collected on it.

Fair raised money to purchase these receivables by selling what it called "investment certificates"—a form of subordinate debenture that essentially functioned as a certificate of deposit without FDIC insurance. Certificate holders were paid interest at regular intervals. When a certificate came due, Fair sent a check to the holder for the interest earned before maturity. At that point the holder could redeem the original face value of the certificate or renew it, which involved redeeming an old certificate and purchasing a new one. If a holder took no action at expiration, the certificate would continue earning interest at a set rate. Before 2002 most certificates were offered for a six-month term and were no larger than $50,000 in value. The latter limitation was meant to ensure that the company could redeem the certificates without encountering liquidity problems.

Certificates were sold exclusively to consumers in Ohio, and authorization by the Ohio Department of Securities was required. With each request for authorization, Fair needed to submit an offering circular disclosing its financial status and the investment's risks. The circular would then be distributed to potential investors once the new issuance received regulatory approval. According to data gathered by Fair, a majority of its investors were elderly and many lived on modest incomes. By all accounts, Fair was a trusted Ohio financial institution.

Timothy Durham and James Cochran bought the business in 2001 through a holding company formed for that purpose and named Fair Holdings, Inc. Durham was its CEO, Cochran was its COO and chairman of the board, and Rick Snow was its CFO. Snow already had been working at Fair and soon became CFO for another Durham-owned company, a private equity fund called Obsidian Enterprises. At the time of the acquisition, Fair had assets of $50 million in receivables and liabilities of $38 million in certificates.

Fair soon dramatically increased its sale of certificates and offered them for longer terms (up to 5 years), higher amounts (up to $200,000), and at higher interest rates. Within a year and a half, its certificate liabilities doubled. The increased capital, however, was not used to expand its receivables business, which grew slightly after the purchase but soon started to taper off. Instead, the money raised was used to fund millions of dollars in loans, often made through Fair Holdings, to Durham and Cochran, their relatives, and related companies

(particularly Obsidian and another Durham-owned holding company named DC Investments).

Much of this money funded Durham's and Cochran's extravagant lifestyles. Loan proceeds paid for their homes, cars, and parties. For example, Durham hosted a Playboy-themed party using $110,000 of Fair money. Likewise, Cochran used $783,867 to fund a real-estate purchase. Even loans to other companies served to support Durham and Cochran's spending habits; for example, a Fair circular reflected a loan of more than $9 million to the company that held Durham's personal car collection. Fair rarely received any payments on these loans, most of which were not made on commercially available terms, were poorly documented, and were amended as time went on to increase the debtor's borrowing limit. Yet Fair's circulars continued to list these loans as assets supporting the sale of certificates.

Fair Holdings's accountants soon began questioning its financial statements, raising numerous concerns about the third-party loans and noting that they lacked sufficient collateral. The auditors also had doubts about the holding company's viability as a going concern. The defendants terminated the services of two different accounting firms that refused to issue unqualified audit reports. After that the holding company's financial statements were unaudited and replete with misrepresentations.

Things began to fall apart after the financial crisis in the fall of 2008. In Durham's words, "every company" in his organization was "running on vapor." Facing cash shortfalls, Fair delayed payments of interest and principal to investors,

blaming computer and banking issues. It fell behind on payments to dealers and vendors as well. Investors began to worry; Fair had historically made interest payments on time, and the financial press started criticizing Durham's management. In February 2009 the Ohio Department of Securities opened an investigation. By this time Fair's 2008 authorization to issue $250 million in certificates was almost used up. Without the ability to sell more certificates, Fair was unable to generate new income. Desperate for cash, Fair sought regulatory authorization to issue another $250 million in certificates in October 2009. It would never be granted.

As problems mounted, the FBI began a criminal investigation into Fair's activities after receiving a proffer from a Fair board member who was targeted in a separate investigation. The board member disclosed that Fair was being operated as a Ponzi scheme. The FBI investigated for approximately eight months, then sought and obtained authorization to tap Durham's phone. Recorded phone calls revealed many discussions about how to hide Fair's true financial status from regulators and investors. In one conversation Cochran advised against letting any employees go because they "know a little bit too much" that could be used to "bust" them. The three executives discussed plans to "vanish," "disappear," "vaporize[]," and "wipe[] off" bad debts from the company's regulatory disclosures. The FBI used this evidence to obtain a warrant to search Fair's office and seize its computer servers, effectively shutting the company down. The warrant was executed on November 24, 2009. Fair's operations ceased, and it soon went into bankruptcy. More than 5,000 investors filed claims totaling

approximately $215 million. The trustee recovered only $5.6 million in assets.

Durham, Cochran, and Snow were charged with conspiracy to commit wire fraud and securities fraud, 18 U.S.C. § 371 (Count 1); wire fraud, 18 U.S.C. § 1343 (Counts 2–11); and securities fraud, 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5 (Count 12). All three were convicted of conspiracy and securities fraud. Durham was found guilty on all ten counts of wire fraud, Cochran on six wire-fraud counts (4, 6, and 8–11), and Snow on three wire-fraud counts (4, 6, and 7). Durham and Cochran received within-guidelines sentences of 50 years and 25 years, respectively. Snow was sentenced to a below-guidelines term of 10 years. The court also ordered the defendants to pay $208,830,082.27 in restitution, for which they are jointly and severally liable.

## II. Discussion

The defendants attack their convictions and sentences on multiple grounds. Durham challenges the sufficiency of the evidence on two counts of wire fraud. All three defendants challenge the sufficiency of the wiretap application. They also argue that the district court erroneously refused to give their proposed theory-of-defense jury instruction on the securities-fraud count. They claim that the prosecutor committed misconduct during his rebuttal closing argument. Finally, they raise several sentencing errors.

**A. Sufficiency of the Evidence on Counts 2 and 5**

Durham argues that the evidence was insufficient on Counts 2 and 5, two of the ten counts of wire fraud of which he stands convicted. Count 2 involved a transfer of $250,000 from Fair to Fair Holdings on February 13, 2007; Count 5 concerned a transfer of $50,000 from Fair to Fair Holdings on November 10, 2008. To prove that these transfers constituted wire fraud, the government needed to establish that Durham: (1) was involved in a scheme to defraud; (2) had an intent to defraud; and (3) used the wires in furtherance of that scheme. *See United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006). We review the evidence "in the light most favorable to the government and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Love*, 706 F.3d 832, 837 (7th Cir. 2013). Durham moved for judgment of acquittal on these counts, so our review is de novo. *United States v. Claybrooks*, 729 F.3d 699, 704 (7th Cir. 2013).

We agree with Durham that there was insufficient evidence in the record to establish that these particular wire transfers were made in furtherance of the fraudulent scheme. The government introduced single-page printouts reflecting each transfer. As to Count 5, the government also introduced an email indicating that an Obsidian employee asked a Fair employee to wire $50,000 to Fair Holdings. At most, this evidence shows that the wire transfers were in fact made; it does not establish that the transfers were made in furtherance of the fraudulent scheme.

The government apparently intended to introduce additional evidence regarding the circumstances of these transfers but neglected to do so. The single-page printouts were meant to be the first pages of much larger exhibits. The complete exhibits were transmitted to us in connection with this appeal; they include financial records tracing the money and documenting how it was used. (For what it's worth at this too-late stage of the case, the additional documentation shows that the $250,000 wire transfer paid for a luxury garage and the $50,000 transfer was used to pay dues at a country club.) But the trial record contains only the single-page printouts showing that the two wire transfers were made. Without the additional documentary evidence, the jury had no evidence about how the money was used.

The government offers up a Hail Mary in an attempt to salvage these two convictions. Its theory is that the trial evidence was sufficient to show that the modus operandi of the entire scheme involved wire transfers between Fair and Fair Holdings. Money from investments in Fair would fund phony insider loans after being moved around by wire. These "loans" would usually start with a wire transfer from Fair to Fair Holdings, just like these two, and the transfers were typically requested via email, as the $50,000 transfer was. In other words, there was a stream of money going from Fair to Fair Holdings and not coming back. Thus, the jury could conclude that these two transfers were used to originate fraudulent loans even without the additional documentary evidence.

This argument is problematic for a couple of reasons. It essentially transforms every wire transfer from Fair to Fair

Holdings into a criminal act. To be sure, the evidence amply supports the basic theory that Fair Holdings was used to further the defendants' illicit scheme, but the government has not established that fraud was its exclusive function. Moreover, because this argument was not raised at trial, Durham was unable to defend against it.

At bottom the government introduced no evidence from which a jury reasonably could conclude that *these particular wire transfers* were made in furtherance of the fraudulent scheme. The gap in the trial record, though inadvertent, leaves us no choice but to reverse Durham's conviction on Counts 2 and 5 based on insufficient evidence.

## B. Proof of Necessity for the Wiretap

In order to obtain authorization for a wiretap, the government must make "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The government's burden "is not great," and compliance with this requirement is analyzed in a "practical and common-sense fashion." *United States v. Campos*, 541 F.3d 735, 746 (7th Cir. 2008) (internal quotation marks omitted). The statute does not require the government to show absolute necessity, *id.*; the point is to ensure that wiretaps are not used routinely as the first step in an investigation, *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991).

The defendants claim that evidence gathered from the wiretap should have been excluded because the government failed to demonstrate the necessity of tapping Durham's phone. We review the finding of necessity for abuse of discretion. *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006).

To obtain authorization to tap Durham's phone, the government submitted a 45-page affidavit summarizing evidence gathered over the course of a nearly eight-month investigation. The government began looking into Fair after a board member advised the FBI that Durham had been running the company as a Ponzi scheme, had made more than $100 million in loans from Fair to related companies, and had made misrepresentations to investors. That was the extent of the board member's cooperation, however. The subsequent investigation involved gathering information through a variety of channels. The FBI contacted the SEC, which was conducting its own investigation of Fair. The FBI also reviewed records in the public domain and subpoenaed from the Federal Reserve Bank of New York. An FBI agent posing as a potential investor spoke with Fair sales representatives over the phone, met with them twice in person, and ultimately purchased a certificate in an effort to gather relevant information about the scheme. The FBI also interviewed two confidential informants who provided some useful information but were not close enough to the scheme to provide current information about Durham's activities. Agents also used a pen register to monitor Durham's phone calls.

The affidavit went on to explain that these measures had not yielded enough evidence to successfully prosecute Durham

or reveal other guilty parties; it also explained that other standard investigative techniques were not viable under the circumstances. If Fair was operating as a Ponzi scheme, the investigation needed to move quickly in order to protect investors. Subpoenaing and sifting through volumes of financial records looking for proof would be too slow. So too would attempting to infiltrate the scheme's inner circle; that would require getting an undercover agent in place and allowing time to penetrate what was likely to be a cautious group of fraudsters. On the other hand, if the company was merely undercapitalized, secrecy was vital, and word of a criminal investigation could provoke a run causing Fair to collapse when it otherwise could be saved. So subpoenaing witnesses and internal records or executing a search warrant would be unwise. Other methods of investigation had exhausted their utility. The FBI had no further leads on informants with more direct knowledge of the scheme, and pen registers had revealed all they could.

This thorough affidavit easily established the necessary foundation for the wiretap. Far from asking for a wiretap after little conventional investigation, the government first used a variety of other techniques to gather information. And the wiretap application provided a reasonable explanation as to why other standard investigative techniques would not be appropriate.

The defendants counter that the stated reasons for the wiretap were too generic and relied on inherent limitations in other investigative techniques that could apply to any investigation of large-scale financial fraud. But the affidavit did not

merely state the limitations of a given alternative in general terms—it did not say, for example, that a pen register only showed the phone numbers called but not the contents of those conversations. Instead, the affidavit tied the limitations to the particular investigation at hand. That the justifications might apply in other, similar investigations is not fatal to an application for a wiretap; a particular kind of crime may pose common, recurring problems for investigators. What matters is that other available investigative procedures had been tried, or were inadvisable or unlikely to succeed under the circumstances. The government's application established the necessary foundation for the wiretap as required by § 2518(1)(c).

The defendants rely on some authority from other circuits, but the cases are distinguishable. For example, *United States v. Blackmon*, 273 F.3d 1204, 1207–08 (9th Cir. 2001), applied de novo review, not review for abuse of discretion, the standard used in our circuit. Moreover, the wiretap affidavit in *Blackmon* was highly generic and also riddled with errors. Finally, the majority opinion in *Blackmon* drew a strong dissent arguing that abuse of discretion was the correct legal standard and explaining that the affidavit was sufficient under that standard. *See id.* at 1211–12 (Wardlaw, J., dissenting). *United States v. Lilla*, 699 F.2d 99 (2d Cir. 1983), is likewise distinguishable. It involved an affidavit containing a bare conclusion that no other investigative techniques would suffice without explaining "what, if any, investigative techniques were attempted prior to the wiretap request." *Id.* at 104. In contrast, the affidavit here contained many pages of information detailing the government's previous efforts and a reasoned explanation of why other techniques would be inadvisable or likely unproductive.

The government met its burden of showing necessity for the wiretap.

## C. Securities-Fraud Jury Instruction

The defendants also challenge the district court's refusal to give their proposed securities-fraud jury instruction, which described their theory of defense by defining the phrase "in connection with the purchase or sale of any security" under § 10(b) of the Securities and Exchange Act of 1934. 15 U.S.C. § 78j(b). A defendant is entitled to a theory-of-defense jury instruction if:

> (1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the [defendant] a fair trial.

*United States v. Walker*, 746 F.3d 300, 307 (7th Cir. 2014) (internal quotation marks omitted).

Section 10(b) of the Act makes it a crime "[t]o use or employ, in connection with the purchase or sale of any security … [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC implements this provision through Rule 10(b)-5, *see* 17 C.F.R. § 240.10b-5, which "is coextensive with the coverage

of § 10(b)." *S.E.C. v. Zandford*, 535 U.S. 813, 816 n.1 (2002). The defendants' proposed instruction sought to define the scope of liability under § 10(b) to advance their theory of defense that "a scheme to delay is not a scheme to defraud."[1] The district

---

[1] The entire proposed instruction reads:

> The fifth element that the government must prove beyond a reasonable doubt is that a subordinated lender (a Fair Finance Investment Certificate purchase) purchased or sold investment securities from Fair Finance and that the purchase or sale of the interests was made in connection with the alleged untrue statements of material fact.

> First, there must be a purchase or sale of a security. This means that the transfer of ownership of an asset is required for a purchase and sale. Simply continuing to holding [*sic*] a security does not qualify. Furthermore, delaying an interest payment or redemption of an Investment Certificate is not a purchase or sale of a security.

> Second, to satisfy the "in connection with" requirement, the government must prove beyond a reasonable doubt that there was some nexus or relationship between the alleged untrue statements of material fact and the purchase or sale of interests in Fair Finance. The misrepresentations must have some direct pertinence to a securities transaction. Evidence that defendants made untrue statements or omissions of material fact *following* the purchase of an Investment Certificate is inadequate. Likewise, evidence that investors purchased or sold interests in spite of defendants' alleged untrue statements of material fact is insufficient. Instead, the government must prove beyond a reasonable doubt that investors actually purchased or sold some or all of their Investment

(continued...)

court rejected the proposed instruction, opting instead to give one that mirrored the statutory language. We review that decision de novo. *Love*, 706 F.3d at 838.[2]

The defendants' proposed instruction runs into trouble both in its statement of the law and its fit with the facts of the case. At the outset we note that the instruction takes a too-narrow view of the "in connection with" language in § 10(b). When the Supreme Court has "sought to give meaning to the phrase ['in connection with'] in the context of § 10(b) and Rule 10b-5, it has espoused a broad interpretation." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit ("Merrill Lynch")*, 547 U.S. 71, 85 (2006).[3] The defendants asked the court to

---

[1] (...continued)
> Certificates in Fair in connection with the defendants' alleged untrue statements of material fact.

[2] The government argues that we should review for plain error because the defendants forfeited this claim. We disagree. At the instruction conference, Durham's counsel submitted and argued for the proposed instruction, which the judge then denied. That is enough to preserve the issue for review. Counsel did not need to object immediately after this colloquy to avoid forfeiture. *See United States v. James*, 464 F.3d 699, 707 n.1 (7th Cir. 2006).

[3] *Merrill Lynch* interpreted the key phrase "in connection with" the purchase or sale of a security in the context of the Securities Litigation Uniform Standards Act of 1998, which

> prohibits securities class actions if the class has more than 50 members, the suit is not exclusively derivative, relief is sought on the basis of state law, and the class action suit is

(continued...)

instruct the jury that a misrepresentation is made "in connection with" the purchase or sale of a security if it has "some direct pertinence" to the transaction. The Supreme Court, on the other hand, has treated the in-connection-with requirement as merely requiring a misrepresentation "coincid[ing]" with, *Zandford*, 535 U.S. at 822, or "touching," *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12 (1971), a securities transaction.

Moreover, the core theory reflected in the defendants' proposed instruction—that "a scheme to delay is not a scheme to defraud"—is problematic as a legal matter and in the context of the evidence in this case. Many, though not all, of the misrepresentations in this case were statements falsely explaining the delayed interest payments or encouraging investors to delay redemption of their investment certificates. The defendants urged the court to instruct the jury that "[s]imply continuing to hold[] a security does not qualify" as a purchase or sale of a security. This argument was premised on civil cases involving the judicially created private cause of action under § 10(b) and Rule 10b-5, but the "rules governing private

---

[3] (...continued)

> brought by "any private party alleging a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security."

*Brown v. Calamos*, 664 F.3d 123, 124 (7th Cir. 2011) (quoting 15 U.S.C. §78bb(f)(1)). Though appearing in different statutory sections, the Supreme Court has treated the in-connection-with language appearing in both provisions as having the same meaning. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85–86 (2006).

Rule 10b–5 actions … developed differently from the law defining what constitute[s] a substantive violation of Rule 10b–5." *Merrill Lynch*, 547 U.S. at 80.

More specifically, in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975), the Supreme Court concluded that only plaintiffs who were themselves purchasers or sellers of a security had standing to sue for securities fraud, a requirement often referred to as the "purchaser-seller" rule or "*Birnbaum* Rule." *See Merrill Lynch*, 547 U.S. at 80. This rule is meant to cabin the reach of private actions for securities fraud. The defendants' argument for their proposed instruction is based on cases drawn from that context. For example, the defendants cite *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1977), which relied on *Blue Chip Stamps*—not the text of § 10(b)—to conclude that "fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs were induced fraudulently not to sell their securities." Another example is *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1443 n.7 (5th Cir. 1993), which also involved a private cause of action. *Krim* cited *Blue Chip Stamps* for the proposition that "[i]t is well established that mere retention of securities in reliance on material misrepresentations or omissions does not form the basis for a § 10(b) or Rule 10b-5 claim."

But what matters in this context is the scope of substantive criminal liability under § 10(b), not the judicially created rules for private civil actions. *See Merrill Lynch*, 547 U.S. at 84 ("*Blue Chip Stamps* … purported to define the scope of a private right of action under Rule 10b-5—not to define the words 'in connection with the purchase or sale.'"); *see also Blue Chip*

*Stamps*, 421 U.S. at 751 n.14 ("[T]he purchaser-seller rule imposes no limitation on the standing of the SEC to bring actions for injunctive relief under § 10(b) and Rule 10b-5."). This line of cases does not provide a defense to criminal liability for securities fraud. The proposed instruction thus would have misled the jury about the scope of § 10(b).

Moreover, the proposed instruction lacked an adequate foundation in the evidence. In the context of the broader scheme at issue here, the defendants' misrepresentations did not merely induce investors to "continue to hold" their investment certificates. Fair's investors made decisions to buy, renew, or redeem their certificates based on a massive fraud that included lulling statements about the delayed interest payments as well as misrepresentations intended to induce delayed redemptions. The reliable payment of interest was precisely what gave the investment certificates value and would have played a large role in an investor's decision to cash out an existing certificate, renew that certificate (which itself involved issuance of a new certificate), or buy one for the first time. In addition, the defendants made misrepresentations in Fair circulars about the general financial status of the company and how it used investors' money.

Finally, the judge's decision to instruct the jury using the statutory language hardly deprived the defendants of a fair trial. They were free to argue their theory that a scheme to delay is not a scheme to defraud, and in fact did so. Accordingly, the district court did not err in rejecting the defendant's proposed instruction; neither the law nor the evidence supported it.

**D. Prosecutorial Misconduct**

The defendants next argue that the prosecutor's comment on an argument made by Cochran's counsel, William Dazey, constituted prosecutorial misconduct. In closing argument Dazey said the following:

> [T]here may have been some reference today [by Durham's counsel in closing] of Mr. Durham having a right hand and a left hand that performed various functions along the way. And I hope for Mr. Durham's sake, and I hope for Mr. Cochran's sake, that his counsel's presentation is persuasive. And I hope that your finding might be that there is a reasonable doubt as to whether Mr. Durham participated in a scheme to defraud. That is none of my business.
>
> *The answer is, no, I think there was a scheme to defraud*. The question is, was there anybody else that was let in on that scheme?

(Emphasis added.) In rebuttal the prosecutor briefly referred to Dazey's statement: "Let's talk about Mr. Cochran. Now, you heard Mr. Cochran's attorney tell you that there was a scheme to defraud but that Mr. Cochran didn't have a role in it. Well, Mr. Cochran's role was absolutely critical to making this thing happen." Neither Durham's nor Snow's lawyer objected.

The day after closing arguments, counsel for Durham and Snow moved for a mistrial, arguing that Dazey's comment amounted to an improper expression of personal opinion about the guilt of their clients in violation of ethical rules. In

response Dazey told the judge that he had heard a report about his comment on National Public Radio that morning and realized that he had misspoken. He explained that he had intended to argue in the alternative—that there was no scheme, but if there was, his client played no part in it. But he inadvertently omitted the qualifier "if." After replaying the audio of Dazey's closing argument, the judge accepted this explanation and concluded that Dazey had not improperly offered his personal opinion about the guilt of the other defendants but had simply misspoken.

The defendants do not challenge that characterization of Dazey's comment. Instead, they focus for the first time on the prosecutor's response to Dazey's misstatement, insisting that it amounted to prosecutorial misconduct. We review a claim of prosecutorial misconduct in two steps. First, we determine whether the prosecutor's comments were improper standing alone. *United States v. Bell*, 624 F.3d 803, 811 (7th Cir. 2010). Second, we ask whether the remarks in the context of the whole record denied the defendants the right to a fair trial. *Id*.

We note for starters that this argument was forfeited below. Although the judge mentioned in passing that the prosecutor's comment did not amount to misconduct, the defendants never raised or developed such a claim, instead focusing only on Dazey's error. Accordingly, our review is for plain error only, which in this context requires the defendants to demonstrate "that the comments at issue were obviously or clearly improper," and "not only [were the defendants] deprived of a fair trial, but also that the outcome of that trial probably would have been different absent the prosecution's remarks." *United*

*States v. Hills*, 618 F.3d 619, 640 (7th Cir. 2010) (internal quotation marks omitted). This is a steep hill to climb.

First, the prosecutor's statement in rebuttal was not clearly or obviously improper. Though Dazey's argument was made in the alternative when viewed with the benefit of hindsight, the prosecutor's characterization of it was, in a strict sense, accurate. And the prosecutor was not given the benefit of hindsight or an opportunity to review a transcript of Dazey's closing—he was speaking in rebuttal and had to craft his argument in real time. Even the defendants' counsel did not realize a mistake had been made. Dazey needed a reminder brought to him courtesy of NPR, and no one else from the defense table objected during the prosecutor's rebuttal.

Second, even assuming for the sake of argument that the prosecutor's statement was improper, it did not deny the defendants a fair trial. To determine prejudice, we consider the following factors:

> (1) whether the prosecutor misstated the evidence; (2) whether the remark implicated a specific right; (3) whether the defendant invited the remark; (4) whether the district court provided (and the efficacy of) a curative instruction; (5) whether the defendant had an opportunity to rebut the remark; and (6) the weight of the evidence against the defendant.

*United States v. Clark*, 535 F.3d 571, 580–81 (7th Cir. 2008). Most of these considerations weigh against a finding of prejudice. First, the prosecutor did not misstate the evidence. If there was an error at all, Dazey invited it by misspeaking, and again none

of the defendants objected during the prosecutor's rebuttal. As such, any lack of opportunity to take corrective action falls on the defendants.

Finally, the government's evidence was very strong. It's highly implausible that this single, passing remark during the prosecutor's rebuttal affected the jury's verdict. Finding prejudice on plain-error review requires that the outcome of the trial probably would have been different without the prosecutor's remark. That standard is not remotely satisfied here.

**E. Sentencing**

Finally, the defendants raise several challenges to their sentences and the restitution order. We review the district court's factual findings at sentencing for clear error; claims of procedural or legal error are reviewed de novo. *United States v. Mei*, 315 F.3d 788, 792 (7th Cir. 2003). Restitution orders are reviewed for abuse of discretion. *United States v. Allen*, 529 F.3d 390, 394 (7th Cir. 2008).

### 1. *Unwarranted Sentencing Disparities*

Before imposing a sentence, the district court is required to consider the sentencing factors in 18 U.S.C. § 3553(a) and address any substantial arguments made by the defendant. *United States v. Panice*, 598 F.3d 426, 443 (7th Cir. 2010). At sentencing Durham raised an argument about unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6) (requiring the

sentencing court to consider the need to avoid unwarranted sentencing disparities). He cited several cases from other districts—including some from New York—in which the defendant received a shorter sentence than the guidelines called for in his case. The district court rejected this argument, saying:

> I don't know about what goes on in the Southern District of New York. I visit there only rarely. This is the Heartland. This is where we work hard. We work hard to put our kids through school, which is what a lot of these folks wanted to do, to pay for our houses, to get them paid off by the time that we retire so that we can maybe take some trips or buy a little place in Florida. We drive Chevies and Buicks and Fords, not Bugattis.

The judge continued in a similar vein when sentencing Cochran:

> You need to understand there have been some arguments made in the case that talk about whether white-collar criminals are punished too severely or too lightly. I can't look to cases from other districts, and your lawyers haven't really made that argument to me. But as I said before, this case involves people in the Heartland of America.
>
> These are people who worked very hard and saved because they wanted to be secure in their retirement, because they wanted to pay off their

homes, because they wanted to send their kids to
college, because in many circumstances they
wanted to have enough money to be able to
supplement whatever kind of healthcare might
be provided.

The defendants now argue that the judge's comments
suggest that she mistakenly believed that she lacked the
authority to consider cases from outside the Southern District
of Indiana or the American "heartland" more generally. That's
implausible, and in any event, we disagree. Considered in
context, the judge's remarks do not suggest that she thought
she was *legally barred* from considering the other sentences but,
rather, that she was exercising her *discretion* not to consider
them in light of the particularly severe consequences of the
fraud in this case. The judge focused on the victims of the
defendants' scheme, many of whom were elderly and working
class, and declined to give weight to sentences imposed
elsewhere. Nor did the judge claim to be following a binding
legal rule. *Cf. United States v. Prado*, 743 F.3d 248, 252 (7th Cir.
2014) (finding procedural error after the sentencing judge
stated incorrectly that "the Seventh Circuit has stated that any
argument relating to unwarranted sentence disparities has to
be presented on a national basis"). We find no error.

### 2. *Loss Calculation and Restitution*

The Sentencing Guidelines provide for an increase in
offense level based on either the actual or intended pecuniary
loss resulting from an offense. U.S.S.G. § 2B1.1 cmt. n.3(A). In
this case, both loss calculations were in the $200-million to

$400-million range, resulting in the application of a 28-point enhancement. *Id*. § 2B1.1(b)(1)(O). A district court "need only make a reasonable estimate of the loss, not one rendered with scientific precision." *United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007); *see also* U.S.S.G. § 2B1.1 cmt. n.3(C). The government bears the burden of proof on the loss amount. *United States v. Vivit*, 214 F.3d 908, 916 (7th Cir. 2000). To challenge that amount, the defendant must provide "substantiated evidence … to counter the government's explicit proof of loss." *Gordon*, 495 F.3d at 432. The defendants challenge both the intended and actual loss amounts.

As a threshold matter, the defendants claim that the judge failed to adequately address their specific objections to the loss amount in violation of Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure, which generally requires the district court to rule on disputed factual issues. "[W]e have characterized the requirement outlined in Rule 32(i)(3)(B) as one imposing a minimal burden." *United States v. Brown*, 716 F.3d 988, 994 (7th Cir. 2013) (internal quotation marks omitted). As long as the judge's treatment of factual disputes at sentencing gives us an adequate record to enable appellate review, Rule 32(i)(3)(B) is satisfied. *See id.* at 995; *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). Here, the judge made specific findings on the intended and actual loss amounts, explained her findings, and rejected the defense evidence and objections. Nothing more is required.

### (i) *Actual loss*

Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). The district court concluded that the actual loss resulting from the defendants' fraud was $202 million. This calculation was based on a report from Fair's trustee in bankruptcy. After a thorough review of Fair's books and the claims submitted by investors, the trustee reported that Fair's investors were owed more than $208 million (excluding claims for $7 million in interest payments) and that around $5.6 million in assets were recovered, resulting in a net loss of $202 million. (The government notes the arithmetic here is off and the net loss should have been a bit higher, but that does not affect the analysis.) This evidence is easily sufficient on its own to support the judge's finding of actual loss. In addition to the trustee's calculation, the judge heard substantial evidence at trial that the money from the certificates issued by Fair ended up in the pockets of the defendants and related parties.

The defendants contend that their fraud did not cause the full $202 million in losses. Instead, they cast partial blame on the effects of the 2008 financial crisis and the ensuing recession. But they did not substantiate that claim. The only hard evidence they submitted consisted of an affidavit of a former Obsidian employee attributing Fair's declining value to market forces and valuations generated by Fair itself reporting that it had more assets than liabilities in November 2009. But Fair's own internal accounting could not be trusted; the evidence established widespread manipulation of its financial information. And the affidavit from the former Obsidian employee is

very general; it does not indicate how much of the loss in value
was attributable to broader problems affecting the American
economy. While it is certainly possible that the recession
compounded the effects of the defendants' fraud, there is no
reliable evidence establishing whether and to what extent it
actually impacted Fair's business.

The restitution order was premised on the court's finding
of actual loss, and appropriately so. *See Allen*, 529 F.3d at
396–97. Because we find no error in the judge's actual-loss
finding, the defendants' challenge to the restitution order
necessarily fails.

### (ii) *Intended loss*

Intended loss refers to the pecuniary harm that was
intended to result from an offense and includes "harm that
would have been impossible or unlikely to occur." U.S.S.G.
§ 2B1.1 cmt. n.3(A)(ii). To calculate the intended loss, the
district court looked to the amount placed at risk by the
scheme. *See United States v. Lauer*, 148 F.3d 766, 768 (7th Cir.
1998). At the time Fair collapsed, nearly all of its approved
$250 million offering from 2008 had been issued, and it was
seeking (though never received) approval for another offering
of the same size. Based on the size of Fair's most recent
certificate offering, the district court concluded that the
defendants' scheme placed $250 million at risk.

The defendants argue that the "placed at risk" standard
fails to account for the defendant's subjective intent. But this
standard is well established in this circuit. *Id.* ("[T]he amount

of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property."); *see also United States v. Brownell*, 495 F.3d 459, 463 (7th Cir. 2007); *United States v. Swanson*, 483 F.3d 509, 513 (7th Cir. 2007); *United States v. Lane*, 323 F.3d 568, 585 (7th Cir. 2003). The rule is particularly well suited for application to Ponzi schemes. Ponzi schemes themselves generate no legitimate gains; they "will inevitably collapse at some point, when the volume of new money from new investors/victims is no longer sufficient to meet the demands and expectations of the earlier investor/victims." *United States v. Castaldi*, 743 F.3d 589, 597 (7th Cir. 2014). After money is raised through investment, the question is not whether it will be lost but when and by whom. It's worth noting that none of the authorities cited by the defendants in their attempt to undercut *Lauer* involved a Ponzi scheme.

Nor is the placed-at-risk standard necessarily inconsistent with this court's general position that "[i]n determining the intended loss amount, the district court must consider the defendant's subjective intent." *United States v. Middlebrook*, 553 F.3d 572, 578 (7th Cir. 2009). For instance, in *Mei* we upheld the use of the placed-at-risk standard to determine intended loss in a scheme involving credit-card fraud. 315 F.3d at 793. The evidence in *Mei* established that the defendant intended to use each credit card to its limit; we held that the district court properly estimated intended loss by multiplying the average maximum credit limit of the recovered cards by the total number of cards used in the conspiracy. *Id.*

Similarly here, the evidence established that the defendants intended to place the full value of their certificate authorization at risk. For example, in discussing the ramifications of the state agency's refusal to authorize the fall 2009 offering, Cochran said, "[I]f the[y're] gonna blow us up, we're gonna blow them up. … Fifty four hundred investors aren't gonna f*ckin[,] I mean it would be a catastrophic event in the [S]tate of Ohio." Durham also told Snow,

> I mean, [we're] betting obviously on a renewal … of our offering certificate, if the renewal doesn't happen all bets are off (laughs) anyway, for everything … either the renewal happens and we[']re able to kick back up investment deposits [or] it doesn't and then we[']re all f*cked anyway, we just kind of go into liquidation mode of everything anyways.

The defendants also argue that the district court erred in not accounting for money from the $250 million 2008 offering that was repaid to investors. The sentencing guidelines allow the application of a "credit against loss" when money is repaid before discovery of a crime. *Brownell*, 495 F.3d at 463–64 (citing U.S.S.G. § 2B1.1 cmt. n.3(E)). The defendants concede that they adduced no evidence of repayment in the district court. Instead, they argue from inferences drawn from the trustee's report. Approximately $250 million worth of certificates were issued, yet investors only claimed $208 million in losses from those investments, suggesting that $42 million must have been repaid. Or so the argument goes.

Nothing supports the inference of repayment. It's speculative at best; we simply do not know whether the holders of the unaccounted-for $42 million in certificates were repaid or merely did not file claims in the bankruptcy. The defendants also cannot demonstrate whether the supposed "repayments" occurred before or after their criminal conduct was uncovered—a necessary finding in order to apply the credit. *See id.* at 463.

Finally, any error related to intended loss is harmless. The district court's actual loss finding is independently sufficient to support the sentencing enhancement.

### III. Conclusion

For the foregoing reasons, we REVERSE Durham's convictions on Counts 2 and 5 and REMAND for resentencing without those counts. In all other respects, the defendants' convictions and sentences are AFFIRMED.