NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 3, 2018
Decided March 8, 2018

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

MICHAEL J. REAGAN, *District Judge**

No. 17-1501

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 14-CR-00103-1 |
| GREGORY WEBB, *Defendant-Appellant*. | Virginia M. Kendall, *Judge*. |

**O R D E R**

Gregory Webb was convicted of three counts of wire fraud and six counts of mail fraud for perpetrating a multiyear, multimillion dollar scheme to keep investors buying shares in his failed business. The district court sentenced Webb to concurrent prison terms of 108 months and ordered restitution in the amount of $9,359,384.57. On appeal, Webb raises one ground for relief, challenging the sufficiency of the evidence underlying his conviction. Webb originally challenged the district court's calculation of restitution under the Mandatory Victims Restitution Act as well, but his counsel expressly abandoned this claim at oral argument, so we do not address this issue. Finding no merit in Webb's insufficiency of the evidence argument, we affirm his conviction and sentence.

---

* Of the Southern District of Illinois, sitting by designation.

I.       Background

In the spring of 2003, Gregory Webb founded a technology company called InfrAegis. Throughout the company's existence, he was the chairman, chief executive officer and majority shareholder. The company's purported mission was to protect the public from terrorism by developing technology that could detect potential threats. Webb's primary development efforts went towards an all-in-one security kiosk and detection device called the "iaMedium" that would be placed along public thoroughfares in major cities. Despite Webb's best efforts, by January of 2007, it was clear that InfrAegis was doomed to fail. Faced with the inevitable collapse of his company, Webb began lying to potential investors about nearly every aspect of the business.

The flagship of InfrAegis was the iaMedium. Webb claimed that the iaMedium could perform any number of revolutionary and extraordinary security functions such as: (1) passively detecting nuclear, biological and chemical weapons out in the open, as people walked past the machine; (2) detecting threatening behaviors or threatening people as they walked by on a crowded street; (3) triangulating the location of gunfire; and (4) providing counter-measures to first responders faced with a biological, chemical or nuclear attack. The iaMedium also allegedly possessed 360 degrees of camera coverage, facial recognition software and video displays that Webb hoped to utilize for personalized advertising. Webb's claims about the iaMedium's abilities did not comport with reality. Indeed, despite ten years of work, the company never created a single fully-functional product.

Webb's sensational claims were not limited to his terrorism deterrence efforts. At some point, InfrAegis operated a subsidiary called Bacteria Sciences Worldwide ("BSW") that was focused on agriculture and food products. BSW's successes, according to Webb, included the following improbable "breakthroughs": (1) a food additive that can eliminate 99.9999% of bacteria in food and still be safe for consumption; (2) a fertilizer that is so effective that two gallons replace one ton of regular fertilizer; (3) an all-natural white powder that when added to food would instantly remove all the fat in the product; and (4) a kit that could accurately test an entire agricultural farm field for the presence of bacteria in three hours, when the current prevailing testing takes anywhere from twenty-four to forty-eight hours. These were not simply lofty development targets. Rather, investors were told by Webb that InfrAegis possessed these revolutionary products. Again, Webb's ground-breaking claims did not comport with reality.

Throughout trial it was made abundantly clear that the alleged products either did not exist or, at best, were in the initial laboratory stages of development. Nevertheless, Webb fraudulently proclaimed to investors that the products were ready for deployment.

Without fully-developed or functional products, Webb's business naturally transitioned from tech start-up to tech failure. By January 2007, Webb had exhausted nearly all of his funds and had no legitimate prospect for additional revenue. Facing the inevitable collapse of his company, Webb began lying to potential investors to keep his sole source of revenue from drying up. Documents produced at trial showed that the victim investors were the only material source of income during InfrAegis' entire ten-year existence.

Webb's fraudulent representations were effective in part because he and others in the company were engaged in legitimate efforts to develop the business. For example, senior representatives from the Chicago Mayor's Office testified that they met with Webb and his associates on a few occasions to view demonstrations of the iaMedium. The city officials, who regularly met with vendors for demonstrations, were told that InfrAegis could provide a network of machines detecting terrorist activities in their city with absolutely no cost to taxpayers. All that InfrAegis required in return was permission to place the iaMedium (a large six-foot-tall kiosk) throughout the city on public thoroughfares. According to Webb's business model, InfrAegis would pay for the production, installation and maintenance of the network of iaMediums. The company would then supposedly generate $3 billion in revenue per year through advertising on the screens attached to the kiosk.

Like every other extraordinary claim made by Webb about InfrAegis, the lofty revenue projections were untethered from reality for a variety of reasons. First, Webb knew that his proposed business model was not viable. At a meeting in 2007, the Chicago city officials informed Webb that a separate advertising firm had exclusive rights to advertise for at least two more years in the same areas InfrAegis wanted to place the iaMedium. Second, the existing advertising agency was only generating $150 million per year in revenue. Third, and most importantly, Webb did not have a fully-functional product ready for deployment. When one official discovered that the company had not performed even the most basic due diligence, i.e., field testing the device in cold weather conditions, he terminated the meeting.

None of the negative feedback Webb received from the city of Chicago deterred him from pushing his stock on average citizens. To the contrary, Webb informed existing

and potential investors that InfrAegis had received an "overwhelming endorsement" from the city of Chicago, including the statement: "I can say tonight, that's unequivocal. And in two to three weeks, the contract will be signed and deployment will begin." At trial, each city official told the jury that they were never close to signing a contract with InfrAegis. Nor did they give the defendant any indication that a contract was imminent. When one city official discovered that Webb was representing that "contracts were imminent with the city of Chicago," he became upset and confronted Webb and his co-conspirator about the misrepresentations.

The closest InfrAegis came to deploying the iaMedium in Chicago was an offer to run a limited, no-cost, proof-of-concept pilot program. Despite the offer, the iaMedium was never fully assembled, field tested or deployed.

Webb's efforts to find a city willing to sign a contract with InfrAegis did not stop with the city of Chicago. The same failed pattern played out across multiple cities including Atlanta, Georgia and Washington, D.C. With each city, the promise of a no-cost nuclear, biological   and chemical detection system got Webb in the door; however, issues with basic due diligence ushered him right back out. Nevertheless, Webb continually told potential investors that contracts were "in hand" or "imminent."

One of Webb's most outlandish fraudulent representations concerned his claim that InfrAegis had signed a contract to sell 51% of the company's shares for $8.7 billion. Between 2008 and 2012, Webb repeatedly claimed that an individual named Donald Wamhof had purchased the majority interest in InfrAegis and that the payoff from his investment was "a week to ten days" from concluding.[1] As time progressed and the transfer deadlines passed, investors began questioning Webb as to the status of the deal. In subsequent calls, Webb would explain that the money was pending but "held up overseas" or was held up by "Homeland Security." Like all of the other assurances made to investors, Webb's claims about the $8.7 billion deal were fraudulent representations.

Wamhof is not a multibillionaire venture capitalist as Webb led investors to believe. Wamhof is a 72-year-old, retired mortgage broker whose sole source of income is social security. Wamhof testified at trial that he informed Webb of his plan to raise the $8.7 billion by "monetizing international bills of exchange." The plan, as described to Webb, was to use Wamhof's home computer to simply print "IOUs" on behalf of the U.S.

---

[1] Wamhof signed the bogus contract with InfrAegis on April 21, 2009. Prior to that date, Webb repeatedly represented to potential investors that the huge capital buyout was "imminent."

Treasury Department and then sell the homemade documents to foreign banks.[2] Webb knew that Wamhof did not have the $8.7 billion. He also knew that despite his best efforts, Wamhof had never succeeded in his scheme to "monetize international bills of exchange." Nevertheless, he told investors that the multibillion-dollar infusion was about to hit the company, and investors stood to make a 4,000% return on their investments.

Webb communicated his fraudulent sales pitches primarily through conference calls and offering memoranda. Between 2007 and 2010, Webb led a series of telephonic conference calls in which he provided "updates" about the company's latest developments. Additionally, he would send out offering memoranda and executive summaries that included the same false and misleading information discussed during the conference calls. Webb continued to sell InfrAegis stock to the victim investors even though the State of Illinois issued a Temporary Order of Prohibition from September 2008 until June 2010, precluding anyone affiliated with the company from selling InfrAegis stock.

Webb's trial began on June 27, 2016. After listening to two full weeks of testimony, the jury returned a guilty verdict on all nine remaining counts of mail and wire fraud.[3] Following the trial, Webb was sentenced on March 1, 2017, to 108 months of confinement, concurrent on each count, and ordered to pay restitution in the amount of $9,359,384.57.

II.     Discussion

Webb's sole issue on appeal is that there was insufficient evidence to support his convictions for wire and mail fraud. Webb preserved this argument by moving for a judgment of acquittal before the district court, so our review is de novo. *United States v. Tavarez*, 626 F.3d 902, 906 (7th Cir. 2010). When a defendant challenges the sufficiency of the evidence underlying a conviction, we will reverse only if no rational trier of fact, viewing the evidence in the light most favorable to the government, could have found the defendant guilty beyond a reasonable doubt. *United States v. Chapman*, 692 F.3d 822, 825 (7th Cir. 2012). This is an "extremely deferential" standard that presents a "nearly

---

[2] It is not clear from the record whether Donald Wamhof was a knowing participant in Webb's scheme, an unwitting patsy, or simply delusional about his ability to raise $8.7 billion dollars.

[3] The original indictment contained eleven counts relating to five victim investors. At the conclusion of Webb's case-in-chief, the court dismissed Count 6 and Count 8 because the relevant victim never testified at trial.

insurmountable hurdle" for an appellant. *United States v. Thomas*, 763 F.3d 689, 691 (7th Cir. 2014).

> To convict a defendant of mail fraud, the government must prove:
>
> (1) that the defendant knowingly devised or participated in a scheme to defraud or obtain money or property by means of materially false pretenses, representations, promises, or omissions as described in that count of the indictment; (2) that the defendant did so knowingly and with the intent to defraud; and (3) that the defendant used the United States mail as a carrier.

*United States v. Thyfault*, 579 F.3d 748, 751 (7th Cir. 2009); 18 U.S.C. § 1341.

> To convict a defendant of wire fraud, the government must prove:
>
> (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme.

*United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008); 18 U.S.C. § 1343.

Webb claims that for both the wire and mail fraud charges, the government failed to prove that he knowingly participated in a scheme to defraud and that they failed to prove that he acted with the requisite intent. Four victim investors testified at trial that over the course of several years they listened in on numerous conference calls led by Webb.[4] The witnesses did not have a specific memory of each conference call but instead relied upon a "collective memory" when testifying. Webb asserts that this "collective memory" is a euphemism for an incomplete memory that renders their testimony fatally flawed. Because the victim investors could not differentiate what they heard before they invested from what they heard after they invested, Webb asserts that no reasonable jury could have made such a determination. Relying heavily on our decision in *United States v. Durham*, 766 F.3d 672 (7th Cir. 2014), Webb argues that while there was evidence that the conduct in question occurred, there is no evidence that it was part of a scheme to defraud.

---

[4] The nine surviving counts in the indictment are associated with Webb's criminal conduct against five investor victims--four individuals and an LLC.

In *Durham*, we held that there was insufficient evidence to support two wire fraud convictions when the government introduced only a single-page printout of what was intended to be a much larger exhibit showing how a wire deposit was used in furtherance of a scheme to defraud investors. *Id.* at 678-9. Without the rest of the exhibit, there was no other evidence anchoring the wire transfers to the other criminal activity of the defendants. *Id.* at 679. On appeal, the government attempted to assert that there was sufficient modus operandi of the entire scheme to support the convictions as to the particular wire transfers in question. *Id.* We soundly rejected the "Hail Mary" attempt to salvage the convictions, noting that the record had not established that fraud was the company's exclusive function. Webb asserts that the witnesses' "collective memory" in his case is akin to the incomplete one-page exhibit and that there is nothing left but an impermissible effort by the government to claim that fraud was InfrAegis's exclusive function. We find Webb's interpretation of the record in his case to be unsubstantiated and misguided for two primary reasons.

First, starting in 2007, Webb's statements to the victim investors about the contracts with potential buyers, status of the technology and Donald Wamhof's buyout were always fraudulent. Webb may have had good intentions when he created his company in 2003. However, by January of 2007, it was clear that InfrAegis had failed, and Webb was desperately lying to potential investors to keep his dream alive. Contrary to Webb's assertions, the jury was not presented with calls where Webb "tamped down" projections touted in earlier conference calls. To be clear, the statements presented at trial were not lofty projections. They were fraudulent factual assertions about nearly every aspect of the company.

Second, all four victim investors provided specific testimony as to the fraudulent statements that caused them to invest with Webb. For example, Brian Caine, the victim investor in Count 5 and Count 7, listened to calls from 2009 through 2010. Caine's first investment occurred in January of 2009, when he wired Webb $30,000. After listening to additional calls, he wired Webb another $15,000 in January 2010. Caine testified that he listened to half a dozen calls prior to investing with InfrAegis. When asked why he decided to invest with InfrAegis, he testified it was because Webb represented that almost $9 billion was going to be infused into the company and he felt fortunate to be getting in on the ground floor. Webb would have us reverse Count 5 and Count 7, because Caine referred to his memory as "more of a collective recollection."

We find no ambiguity in Caine's testimony. Starting in 2009, he listened to approximately six conference calls with Webb before investing. During this same time,

we know from multiple other witnesses that Webb was fraudulently representing that the $8.7 billion was "a week to ten days" away from hitting the company. Caine testified that it was this specific representation that caused him to invest with Webb. Qualifying his memories as "more of a collective recollection" does not negate the fact that he provided the jury with specific details about why and when he gave Webb $45,000. Additionally, the fact that Webb continued to lie about nearly every aspect of InfrAegis for another three years and that Caine may have listened to some of these calls does not render his testimony fatally flawed.

A review of the other three victims' testimony yields the same result. All of the witnesses testified that they listened to conference calls led by Webb occurring in the 2007 through 2010 timeframe, and all described the fraudulent statements Webb employed that induced their investments. At best, Webb's "collective memory" argument serves only as an impermissible invitation to second-guess the credibility determination of the jury. *See United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996) ("Questions of witness credibility are reserved for the jury, and its assessment will not be second-guessed by an appellate panel.").

Webb's attempt to draw an analogy between his facts and those of *Durham* fails at the most basic level. It is clear to us that the government did not try a *Durham* "Hail Mary" to secure Webb's conviction. Instead, the government utilized a methodical, compelling offense to secure his guilt. Webb's intent to participate in his scheme to defraud average investors is amply supported by the record. The jury was presented with hours and hours of testimony from investors who described in detail the misrepresentations made by Webb. The government corroborated this testimony with tape recordings of Webb himself boldly and without abandon making false claim upon false claim about the contracts and the status of the devices in various cities. The government introduced offering memoranda and executive summaries that included the same false and misleading information that Webb discussed during the investor conference calls. Finally, the government brought in city officials, scientists and even Donald Wamhof to prove that Webb knew he was lying to potential investors about nearly every aspect of his business.

III.     Conclusion

The record before us contains ample evidence to support the verdict in this case. Having found no reversible error, we AFFIRM the defendant's conviction and sentence.