**AMENDED**
**File Name: 07a0194n.06**
**Filed: March 13, 2007**
**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**Case No. 05-2027**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MICHAEL OZIER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | **ON APPEAL FROM THE** |
| v. | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE WESTERN** |
| RTM ENTERPRISES OF GEORGIA, INC., | ) | **DISTRICT OF MICHIGAN** |
| doing business as Arby's, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |

**BEFORE: BATCHELDER, MOORE, Circuit Judges; and COHN, District Judge.**[*]

**ALICE M. BATCHELDER, Circuit Judge.** Plaintiff-Appellant, Michael Ozier ("Ozier"),

appeals the district court's decision granting summary judgment in favor of Defendant-Appellee,

RTM Enterprises of Georgia, Inc. ("RTM"), in this action in which Ozier claimed race and sex

discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act and 42 U.S.C. § 1981;

retaliation in violation of Michigan's Elliott-Larsen Civil Rights Act and 42 U.S.C. § 1981; and

violation of Michigan's Bullard-Plawecki Employee Right to Know Act. Because we conclude that

Ozier did not establish a *prima facie* case of discrimination or retaliation, and did not present

---

[*]The Honorable Avern L. Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

sufficient evidence to raise a genuine issue of fact with respect to his Bullard-Plawecki claim, we affirm.

## I.

RTM owns and operates Arby's fast food restaurants nationwide, with two restaurants – one on Gull Road and one on Cork Street – in Kalamazoo, Michigan. On December 27, 2000, RTM hired Ozier, an African-American male, to work as an entry-level team member at the Cork Street Arby's, making $8.00 per hour. Ozier generally received positive work performance reviews, and by early 2002, he had received several pay raises and had been made a team trainer, earning $8.60 per hour. Ozier's first manager, Frank Davis, recommended to the area supervisor, Phil Morris, that Ozier should be promoted to shift manager. A subsequent manager, Basem Shamus, also recommended Ozier's promotion to shift manager, but Ozier was never promoted.

In November 2001, D'Ann Tierney ("Tierney"), transferred from an Arby's in Indiana to an assistant manager position with the Gull Road and Cork Street Arby's. She became the store manager of the Cork Street restaurant in June 2002. Tierney observed that Ozier had "excellent customer service skills," and she gave him positive evaluations early in her tenure, observing that "he was reliable, he was always there." Tierney's evaluation of Ozier was not unmixed, however. Her chief criticism and concern was that Ozier was not a productive employee when left unsupervised. She testified that Ozier would do whatever was asked of him, but that she would have to ask him to do it, and he was not self-motivated. Tierney expressed her concern that "if I couldn't trust him to do the maintenance position, then how would I trust him to run a shift, unsupervised?" She explained to Ozier that she would not simply promote him based on the number of years he had worked there, and that he needed to prove himself before being promoted. Tierney believed that

2

Ozier's work performance declined under her management because he was not working with a manager present, whereas under both Davis and Shamus, Ozier had worked along with a manager.

Previous store managers had promised Ozier that he would be promoted to shift manager. When she became store manager, Tierney talked with Ozier about his frustration at not being promoted; she said that she understood that frustration and provided him with the restaurant's 44-page training manual for the shift manager position. This training program is largely driven by the employee, and the employee is expected to take the initiative to learn the material in the manual, and to complete the manual and present it to the manager.

Tierney assigned Bill Goodwin, an assistant manager, to advise Ozier during the training program. She stated that she met with Goodwin and Ozier to discuss the training program, but Ozier claims that they never discussed Goodwin's helping him with the training. Rather, Ozier testified that Mr. Goodwin merely "showed me some paperwork that I was supposed to be learning . . . just little odds and ends that would update me on the [shift manager's] book."

Tierney explained that Ozier was given verbal tests related to the shift manager position, on which he did not perform well, and that he failed to complete most of the sections of his training book, so he did not qualify for any written examinations, which were required to qualify for the promotion. Tierney claimed that Ozier began complaining to other employees in late 2002 that he was being passed over for promotion because he is African-American. Having heard about the complaints, Tierney confronted Ozier and he denied making them. Ozier claims that Tierney then said to him that no one is promoted unless they "kiss a little butt." Tierney denies making that statement.

During this time, Tierney trained three other employees – all caucasian women – for manager positions. Ozier claims that Tierney promised to train him after she was finished training Caralee Waswick, the first of the three, and that no one at RTM ever explained to him why he was not trained for the shift manager position. Tierney denies ever making such a promise. Ozier then complained to the other managers in the store, including Waswick, that Tierney was not training him because of his race. In January 2003, weeks before Ozier's termination, Waswick informed Tierney of his comments.

RTM maintains that Ozier's dismissal was unrelated to his comments and complaints about Tierney, and that he was fired because on four separate occasions, Ozier had end-of-the-day cash shortages in his cash register. Ozier claims he only remembers the third and fourth shortages. The third shortage, in the amount of $20.87, occurred on December 9, 2002, and Ozier received a written warning from Tierney, including notice that another shortage would result in his termination. The fourth shortage, in the amount of $5.09, occurred on February 3, 2003. Tierney did not count the drawer herself, but Waswick reported the shortage to her. Ozier denied that his drawer was short, but he did not count the money in the drawer at the end of the day.

After the fourth shortage, Tierney reported to Phil Morris, the area supervisor, that Ozier's drawer was short again after he had been given a final warning, and Morris agreed that Ozier's employment should be terminated. Tierney stated that the cash shortages were the only reason she had for firing Ozier.

When Ozier arrived at work after the fourth cash shortage, Tierney informed him that his drawer was short again and that he was being fired. Ozier claims that during this meeting, Tierney told him that "I heard you been talking about me behind my back." Ozier denied that his drawer was

short, and questioned whether he was being fired for comments he had made to Waswick. According to Ozier, Tierney responded that in fact his drawer was short and that was why "we're getting rid of you."

Shortly after he was fired, Ozier requested his personnel file. Ozier claims that he received only parts of the file, which did not include any performance reviews or disciplinary write-ups that would ordinarily be included in a personnel file. Ozier submitted a second request for his personnel file along with a letter from his attorney, but RTM has not given him the file, claiming that it cannot be located.

Ozier filed a three-count complaint against RTM in the Michigan state court, alleging that RTM's failure to promote him was the result of race and sex discrimination and retaliation and that RTM's failure to turn over his personnel file violated Michigan's Bullard-Plawecki Act. RTM removed the action to the United States District Court for the Western District of Michigan, and moved for summary judgment on all claims. After hearing oral argument, the district court granted RTM's motion. Ozier filed this timely appeal.

**II.**

We review *de novo* the district court's grant of summary judgment. *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999). Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, "the inference to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Adkins v. United Mine*

*Workers*, 941 F.2d 392, 399 (6th Cir. 1991) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)). The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## A. OZIER'S RACIAL DISCRIMINATION CLAIM FOR ALLEGED FAILURE TO PROMOTE

Ozier alleges that RTM discriminated against him on the basis of race[1] in violation of 42 U.S.C. § 1981. He may establish a claim of discrimination either by introducing direct evidence of discrimination, or by providing circumstantial evidence which would support an inference of discrimination. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). "The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Id*. at 348-49. "Under the direct evidence approach, once the plaintiff introduces evidence that the employer terminated him because of his race or other protected status, the burden of persuasion shifts to the employer to prove that it would have terminated the plaintiff even had it not been motivated by discrimination." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). *See also Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir.1994).

Under the circumstantial evidence approach, we apply the *McDonnell Douglas* test. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The variant of that test that we have applied in failure-to-promote cases requires that in order to establish a prima facie case of racial

---

[1]Although Ozier's complaint also claimed discrimination on the basis of sex, the district court did not mention sex discrimination in its opinion, Ozier does not mention it in his briefs on appeal, and he has apparently abandoned that claim.

discrimination, Ozier must demonstrate that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion, (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000). If Ozier establishes his *prima facie* case, a mandatory presumption of discrimination is created and the burden shifts to RTM to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp.*, 411 U.S. at 802. If RTM carries this burden, then Ozier must prove that the proffered reason was actually a pretext to hide unlawful discrimination. *Id*. at 804. He may establish that the proffered reason was a mere pretext by showing that 1) the stated reason had no basis in fact; 2) the stated reason was not the actual reason; or 3) that the stated reason was insufficient to explain the defendant's action. *See Wheeler v. McKinley Enters*., 937 F.2d 1158, 1162 (6th Cir.1991). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).

The district court properly rejected Ozier's claim that Tierney's alleged comment that he would have to "kiss a little butt" to be promoted amounted to direct evidence of racial discrimination. As we have held, "'simple teasing' or 'offhand comments, and isolated incidents' do not amount to direct evidence of discrimination under Title VII." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). In addition, the district court correctly observed that it was pure speculation to infer that the alleged comment was racially motivated.

Finding no direct evidence of discrimination, the district court analyzed Ozier's claim using the *McDonnell Douglas* approach. The district court acknowledged that Ozier satisfied the first and third prongs of the test, namely that he is a member of a protected class and that he suffered an adverse employment action. *See Nguyen*, 229 F.3d at 562 ("For the purposes of Title VII, a failure to promote is an adverse employment action.") The court then turned to the second prong of the prima facie case, which requires Ozier to demonstrate that he was qualified for the promotion he sought.

The district court found that Ozier had failed to present evidence that he was qualified for the promotion to shift manager. The court noted that although Tierney was sympathetic to the fact that previous managers had recommended Ozier for promotion, she had explained that Ozier lacked initiative and did not perform well without supervision, and that she believed that these characteristics disqualified Ozier for a shift manager position. This evidence is unrefuted in the record. Furthermore, it is undisputed that Ozier's training book "remained almost entirely unmarked"; that the shift manager training program is driven by the employee and the employee is expected to take the initiative in completing the training book and preparing for the promotion examinations; that RTM requires that the training program be completed in order to qualify for promotion, and that Ozier performed poorly on verbal tests, and therefore was never given the written tests necessary for promotion.

From the record, it is clear that the district court did not err in concluding that Ozier was not qualified for the promotion he sought. Because Ozier failed to satisfy the second prong under *McDonnell Douglas*, he failed to establish his *prima facie* case for racial discrimination. Failure to satisfy the second prong is dispositive of the issue, and while we therefore do not need to determine,

as the district court did, that Ozier also failed to satisfy the fourth element of the *prima facie* case because he could not show that he was replaced by a person outside of the protected class or was treated less favorably than a similarly situated individual outside of his protected class, we find no error in that conclusion.

## B. OZIER'S RETALIATION CLAIMS

Ozier alleges that RTM retaliated against him by dismissing him after he claimed that he was the victim of racial discrimination. The district court found that Ozier's claim lacked merit and did not create a genuine issue of fact for trial, and we agree.

Ozier complained about Tierney behind her back on several occasions, making derogatory comments about her and her work ethic, as well as accusing her of discrimination. Tierney testified that in October 2002 she had heard rumors from the other employees that Ozier had been complaining about her, and that she warned him that if he had a problem with her, he should come talk to her about it. Shortly before Tierney fired Ozier in February 2003, she allegedly said, "I heard you been talking about me behind my back." Ozier argues that this statement provides direct evidence of retaliation. The district court disagreed, finding that it would have to speculate about what Tierney meant by the statement because the statement on its own does not "unequivocally connote discriminatory motives," and, therefore, was not direct evidence of retaliation. We agree.

As we have held, "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp*., 176 F.3d 921, 926 (6th Cir.1999). It does not require the fact finder to draw any inferences to reach that conclusion. *See Abbott v. Crown Motor Co*., 348 F.3d 537, 542 (6th Cir. 2003); *see also Nguyen*, 229 F.3d at 563. Here, as the court

9

explained, Ozier has provided only inferences and speculation and the statement itself does not require us to conclude that Tierney was motivated, even in part, by unlawful discrimination in deciding to terminate Ozier's employment.

Finding no direct evidence of retaliation, the court turned to whether Ozier had established a *prima facie* case of retaliation. To meet this light burden, Ozier must show: 1) that he engaged in a protected activity; 2) that this was known to the defendant; 3) that the defendant took an adverse employment action against him; and 4) that there was a causal connection between the protected activity and the adverse employment action. *See Singfield*, 389 F.3d at 563. The court assumed for the sake of argument that Ozier met the first element of the test, and then noted that it was undisputed that he also met the second and third elements.

Under federal law, in order to show a causal connection between the protected activity and the adverse action – the fourth element of the prima facie case – Ozier must produce sufficient evidence to support an inference that RTM took the adverse employment action because Ozier had complained of discrimination. *See EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). Ozier has submitted no evidence other than temporal proximity to support his assertion that there was a causal connection between his complaints against Tierney and his termination. We have held that temporal proximity alone is insufficient to establish a causal connection. *See Little v. BP Explorations & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001)*; Nguyen*, 229 F.3d at 566*; Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986). The record indicates that Ozier has failed to meet his burden of establishing a causal connection and we agree with the district court's decision.

We also agree with the district court that even assuming that Ozier properly established a causal connection, he failed to show that RTM's articulated reason for dismissal was pretextual. As

10

the court rightly observed, RTM has never wavered from its assertion that it dismissed Plaintiff for repeated cash shortages. It is undisputed that terminating employees for repeated cash shortages is consistent with company policy, and that Ozier had been warned that any additional shortages would result in termination. Ozier, although he denies that he was terminated because of the cash shortages in his register, has offered no evidence that he was not in fact terminated because of his fourth cash shortage. Summary judgment for RTM in this case was appropriate.

## C. OZIER'S BULLARD-PLAWECKI ACT CLAIM

Ozier requested from RTM a copy of his complete personnel file, which RTM failed to provide. RTM claims that it cannot locate the file. Tierney testified that upon receipt of Ozier's first request, Morris copied the entire file and Tierney personally sent it to Ozier by certified mail. She testified further that Morris eventually took the file to Cleveland, Ohio, to the general repository for personnel files for individuals whose employment with RTM had been terminated. Affidavits from RTM employees indicate that they extensively searched for Ozier's personnel file, but were unable to find it. Ozier alleges that RTM intentionally destroyed or concealed the file, but has provided no evidence to support his claim. He contends that RTM has violated Michigan's Bullard-Plawecki Act, Mich. Comp. Laws. § 423.503, by failing to produce his personnel file upon request.

The Bullard-Plawecki Act provides in pertinent part:

An employer, upon written request which describes the personnel record, shall provide the employee with an opportunity to periodically review at reasonable intervals, generally not more than 2 times in a calendar year . . . the employee's personnel record if the employer has a personnel record for that employee.

Mich. Comp. Laws § 423.503.

Under § 423.511 of the Act:

If an employer violates this act, an employee may commence an action in the circuit court to compel compliance with this act . . . . Failure to comply with an order of the court may be punished as contempt. In addition, the court shall award an employee prevailing in an action pursuant to this act the following damages:

> (a) For a violation of this act, actual damages plus costs.
> (b) For a wilful and knowing violation of this act, $200.00 plus cost, reasonable attorney's fees, and actual damages.

Whether an employer violates the Bullard-Plawecki Act by losing an employee's personnel file is a question of first impression for this Court. *Michels v. Delaware McDonald's Corp.*, No. 83-CV-1380-DT, 1985 U.S. Dist. LEXIS 21074 (E.D. Mich. Apr. 3, 1985), is the only case in Michigan or this Circuit addressing the issue of a lost personnel file under Bullard-Plawecki. In *Michels*, the employer lost the employee's record but later discovered it, and the court held that if a personnel file is lost, then the employer does not have a personnel record for that employee within the meaning of the Bullard-Plawecki Act and therefore the employer is not required to produce it. *Michels*, 1985 U.S. Dist. LEXIS 21074, at *2. Here, the district court followed *Michels* and concluded that RTM could not produce what it did not have and did not violate Bullard-Plawedki as long as the file was lost.

In this case, Tierney testified that she copied Ozier's personnel file and sent it to him by certified mail, and RTM produced sworn affidavits from RTM employee's indicating an extensive but fruitless search for the missing file. Ozier presented no evidence to the contrary. We recognize that it would be difficult for a plaintiff to demonstrate that an employer intentionally destroyed or concealed a file, but the only evidence in the record is that Ozier's file is lost. We agree with the district court that the reasoning in *Michels* is sound, and we affirm the court's conclusion that, under these circumstances, Ozier has failed to present evidence sufficient to preserve this claim for trial.

12

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the judgment of district court.

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.**

In affirming the district court's grant of summary judgment for RTM on Ozier's discrimination claim, the majority states that Tierney's testimony concerning Ozier's supposed lack of initiative is "unrefuted in the record" and, therefore, that the district court properly determined that Ozier was unqualified for the promotion that he sought. On the contrary, however, the record reflects that, prior to Tierney's arrival at the Cork Street restaurant, Ozier had received consistently positive performance reviews, had been made a team trainer, and had been recommended by several supervisors for management training. Joint Appendix ("J.A.") at 291 (Ozier Dep. at 35-37); J.A. at 312-13 (Tierney Dep. at 54-58).

Moreover, our precedents demonstrate that the majority's reliance on Tierney's testimony is misplaced. In *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003) (en banc), we held that, "[a]t the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Id.* at 575 (citing *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc) (pointing out that "an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination")). Accordingly, I would hold that the evidence establishes a genuine issue of material fact concerning Ozier's qualifications and would affirm the district court's grant of summary judgment only on the ground that Ozier failed to establish the fourth prong of a prima facie case by demonstrating that a similarly situated non-African-American employee was promoted. I therefore concur only in the court's judgment as to this claim.

I also disagree with the majority's holding that Ozier has failed to establish the fourth (causation) prong of a prima facie case of retaliation. In support of that holding, the majority states

14

that "Ozier has submitted no evidence other than temporal proximity" to show causation. Again, however, the majority's statement is at odds with the record, which reveals not only that Ozier was fired soon after complaining of Tierney's racial bias but also that Tierney referred to Ozier's complaints in terminating his employment. J.A. at 114-15 (Ozier Dep. at 54-55). I would hold that this additional evidence is sufficient to establish the causation element of the prima facie case.

The majority further concludes that Ozier has not shown evidence of pretext to rebut RTM's asserted, non-retaliatory reason for his termination. The Supreme Court has, however, held that the evidence proffered in support of a plaintiff's prima facie case may also be considered when determining the issue of pretext:

> A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."); *Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 107 & n.2 (6th Cir. 2005) ("We hold that the same circumstances which established a causal connection between Cantrell's protected activity and her termination also serve as sufficient evidence to [establish pretext]."). Because, therefore, I would hold that Ozier's evidence both establishes a prima facie case and demonstrates pretext, I respectfully

15

dissent from the court's affirmance of the grant of summary judgment for RTM on Ozier's retaliation claim.

Finally, I believe that the majority errs in affirming the district court's grant of summary judgment for RTM on Ozier's claim under the Bullard-Plawecki Right to Know Act (the "Right to Know Act"), MICH. COMP. LAWS §§ 423.501 et seq. It is true that an employer that loses an employee's file before the employee requests it cannot be said to possess the file at the time of the request. In this case, however, it is undisputed that RTM had possession of Ozier's file at the time of his request and only later claimed to have misplaced it while transferring it to a storage facility. If the Right to Know Act is to have any force at all, it must impose upon an employer some affirmative duty to safeguard an employee's file once it has been requested, at least until the employer has ascertained that the requesting employee has actually received the relevant documents. Otherwise, unscrupulous employers are likely to "lose" files deliberately rather than produce them.[2] Accordingly, I respectfully dissent from the court's affirmance of the grant of summary judgment on Ozier's Right to Know Act claim.

---

[2]There is no definitive evidence here that RTM deliberately misplaced Ozier's file, but the oddly coincidental loss of the file shortly after Ozier requested it, combined with Ozier's assertion that he never received the copy allegedly sent to him, give rise at least to an inference favoring his claim. Moreover, we must consider the import of our rulings for future cases and the likely influence of those holdings on future parties' behavior.

16