NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0202n.06

Case No. 16-1111

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 05, 2017
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| SHEILA JOHNSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| FIFTH THIRD BANK, | ) | |
| | ) | **OPINION** |
| Defendant-Appellee | ) | |
| | ) | |

---

**BEFORE: GILMAN, GIBBONS, and STRANCH, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.** Sheila Johnson was fired from her job at Fifth Third Bank in May 2014. Johnson appeals the grant of summary judgment to Fifth Third in her lawsuit alleging retaliation and discrimination under the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 *et seq.*, and Michigan's Elliott Larsen Civil Rights Act (ELCRA), M.C.L. §§ 37.2101 *et seq.* For the reasons that follow, we affirm the district court's award of summary judgment.

I.

In March 2007, Sheila Johnson began working for Fifth Third Bank at the bank's Beecher and Ballenger branch in Flint, Michigan. Johnson was hired as a "Financial Center Manager" and reported to Regional Manager Bobbi Jo Lucas. In this role, Johnson managed bankers who were involved in direct sales to Fifth Third customers. Each month, she was expected to meet 85% of both sales- and total-point-production goals set for her by the bank.

Beginning in 2011, Johnson experienced serious challenges in meeting her sales-production goal. Johnson was issued a "Performance Counseling" report on October 4, 2011, detailing the decline in her sales performance throughout 2011. In May of that year, she met only 56.7% of her sales goal, in June only 67.7%, in July only 52.0%, in August only 41.2%, and in September, Johnson achieved only 33.4% of her goal. The report included detailed steps for her to correct shortcomings and noted that a "failure to achieve and maintain a satisfactory performance level . . . could lead to further corrective action, up to and including termination of employment."

Johnson received another Performance Counseling report on June 13, 2012, after her sales performance in the first half of that year fell well below Fifth Third's expectations. She met only 36% of her goal in January, 56% in February, 72% in March, 44% in April, and 49% in May. Again, the report included detailed, mandatory steps for Johnson to take in order to improve her performance.

Following this second report, Johnson transferred from the Beecher and Ballenger branch in Flint to one in Fenton, Michigan. She also agreed to a demotion to "Personal Banker." Lucas felt that working as a personal banker was Johnson's "ticket to success" because she "would be able to focus 100% on sales rather than leadership responsibilities." Becoming a personal banker was a voluntary demotion, but Johnson felt that it was "pretty much presented . . . that it would be in [her] best interest" to transfer locations, change positions, and take the accompanying pay cut. As a personal banker, Johnson worked under David Engstrom, Fenton's Financial Center Manager.

Although the June 2012 transfer was intended to help Johnson improve her performance and meet her sales goal, she did not show consistent improvement after the transfer. On October

17, 2012, Johnson received a third Performance Counseling report because she met only 65% and 33% of her sales goals in August and September, respectively. The October report described sales as "one of the most important, key aspects of [Johnson's] position and . . . the key performance area in which [she was] assessed." It noted that continued sub-par performance "could lead to further corrective action, up to and including termination of employment." The report required Johnson to achieve 80% of her sales goal for the month of October to avoid further counseling.

In 2013, Johnson received two more Performance Counseling reports in June and July, after meeting only 46.9% and 76.3% of sales goals. By July 2013, Johnson had reached only 51% of her year-to-date sales goal. At this point, the Fifth Third management team considered discharging Johnson for repeatedly failing to meet her sales goals. The team ultimately decided to give her another opportunity to improve because she was experiencing personal problems, but agreed to terminate Johnson "later in the summer or fall of 2013" if Johnson did not improve.

In an attempt to help Johnson, Engstrom referred her to Mary Sissen, an employee-relations consultant. Sissen met with Johnson on July 23, 2013, to determine "if there was anything short of discharge that could remedy [her consistent failure to meet her sales goals]." During the meeting, Johnson reported feeling like she did not "have [the] drive" at work, but that she had started taking anti-depressants to help cope with her personal issues and was feeling more motivated since. Johnson knew her job was in jeopardy but told Sissen that she did not want to lose her job. After the meeting, Sissen recommended that Lucas review Johnson's July performance and if there was improvement, "give her August to continue to improve." If there was not "significant improvement" in August, however, Sissen recommended that Johnson be

"released." Johnson's performance improved for the remainder of 2013. Johnson met more than 80% of her sales goals in August, September, October, and November of 2013.

But her sales performance again fell below 50% of her goal in January 2014 and continued to fall below 80% of her goal throughout the early months of 2014. Johnson attributed her performance in early 2014 to systemic difficulties at the branch. In the first two months of 2014, Lee Hotchkiss, who had replaced Lucas as regional manager, had several conversations with Lucas, Engstrom, and Polakoff about Johnson's performance. In January 2014, they discussed terminating Johnson due to her continued poor performance. On February 13, 2014, Engstrom spoke with Jennifer Polakoff, another employee-relations consultant at Fifth Third, about a meeting he had with Johnson to discuss her performance and establish an action plan to meet 85% of her February goal. In that meeting, Engstrom gave Johnson a detailed plan that broke her monthly goals into smaller weekly goals. Engstrom told Polakoff that he would manage Johnson "very closely, doing observations, huddles and check ins." In a February 13 email to Fifth Third managers who worked with Johnson, Polakoff discussed the possibility that Engstrom would terminate Johnson if she did not meet 85% of her February sales goal. Although Johnson did not reach 70% of her February 2014 goals, she was not terminated.

Johnson received her 2013 annual performance review in early March 2014. She received a "far below expectations" grade in Sales Productivity and her overall rating was "below expectations," but the report noted Johnson's "self reflection and commitment were a key in improving" in 2013 and that if Johnson continued to perform as she had toward the end of 2013, she would have a successful 2014.

Johnson did not meet her sales goals in March. Although she did achieve 74.4% of her goal that month, Johnson continued to struggle. Engstrom met with her several times to explain to her that she needed to improve her numbers.

In mid-April 2014, Johnson told Engstrom that she would need time off for bariatric surgery in November of that year. Johnson did not know the exact date of her surgery, nor did she know exactly how long she would have to be out of work to recover. Johnson told Engstrom she would have to be out anywhere from two to six weeks and wanted to give him advance notice for scheduling purposes. Johnson did not file any formal paperwork, request leave, or provide any further details about her surgery.

On April 29, 2014, Engstrom called Polakoff to discuss Johnson's performance. According to Polakoff, they discussed that "Johnson was again performing unsatisfactorily and was unlikely to reach even 70% of her sales goal, as she was trending at approximately 52% of her sales goal for the month." They also discussed Johnson's "potential discharge if she failed to reach 70% of her sales goal for April." Johnson reached only 64% of her sales goal for April.

Engstrom, Hotchkiss, and a human resources representative met during the first week of May and agreed to terminate Johnson, effective immediately. At the time of her termination, Johnson's sales performance relative to her goals was the lowest of all personal bankers in the "Northwest Region." On May 2, Polakoff approved the decision to terminate Johnson based on her understanding that Johnson's performance "had not improved as a result of previous counseling and coaching." On May 5, Johnson was informed of her termination. She was not offered the opportunity to resign. Engstrom and Hotchkiss maintain that the decision to discharge Johnson was based solely on her consistent history of poor sales performance.

Around the time of Johnson's termination, Engstrom and other Fifth Third managers decided to terminate Thomas Lynch, another personal banker at the Fenton Branch. Lynch was terminated because he had incorrectly approved a check that could have caused Fifth Third to lose approximately $40,000. Engstrom characterized Lynch's mistake as "an issue that occurred very much out of the blue" and was "something . . . very unexpected for [Lynch] because it was a very different category of termination than sales production." Due to the nature of Lynch's mistake, Engstrom "[gave] him the opportunity to resign" instead of being fired. Both Lynch and Johnson were replaced by younger employees, although Johnson acknowledged she had no additional reasons to believe that age was a factor in her termination. Of the new personal bankers who replaced Lynch and Johnson, Engstrom could not say "one specifically replaced [Johnson] and one specifically replaced [Lynch]" because the Fenton branch "lost two bankers back-to-back."

Johnson sued Fifth Third on August 13, 2014. First, Johnson claimed that Fifth Third "interfered with [her] exercise or attempt to exercise her rights to take qualifying medical leave . . . and/or retaliated against [her]" in violation of the FMLA (Count I). Second, Johnson asserted that because Fifth Third "replaced [her] with a substantially younger employee," it engaged in age discrimination in violation of Michigan's ELCRA (Count II). Finally, Johnson alleged that Fifth Third engaged in gender discrimination in violation of the ELCRA because she was not given the opportunity to resign her position (Count III). Fifth Third filed a motion for summary judgment on all three counts. The district court granted Fifth Third's motion in its entirety. Johnson filed a timely appeal.

II.

We review a district court's grant of summary judgment *de novo*. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'" *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 866 (6th Cir. 2006) (citing Fed. R. Civ. P. 56(c)). We ask whether "the evidence—viewed in the light most favorable to the nonmoving party—presents a sufficient disagreement to require submission to the fact-finder, or whether the evidence is so one-sided that the moving party must prevail as a matter of law." *Martin Cty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589, 593 (6th Cir. 2013).

III.

A.

When an FMLA retaliation claim is based on circumstantial evidence, it is governed by the analytical framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[1] *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001) ("In an FMLA case relying upon indirect evidence, we will apply the three-step process delineated in *McDonnell Douglas* . . . to analyze [plaintiff's] claim that he was fired in violation of the FMLA for taking a medical leave of absence."). Under the *McDonnell Douglas* framework, Johnson must first establish a *prima facie* case of discrimination. 411 U.S. at 802. If she is able to do so, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the employer's conduct. *Id.* If the employer can provide a legitimate, nondiscriminatory

---

[1] Although the parties briefed the potential applicability of a mixed-motive analysis at the court's request, ultimately we conclude that Johnson's claims and the asserted evidentiary basis for them do not fit mixed-motive analysis.

reason for the conduct, then the question becomes "whether that reason was simply a pretext designed to mask discrimination." *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007).

Throughout this framework, "the plaintiff retains the ultimate burden of persuasion at all times." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186–87 (6th Cir. 1996). To make a showing of pretext, Johnson must show by a preponderance of the evidence "either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [her] discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (quoting *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)). Even if Johnson makes out a *prima facie* case of discrimination, she cannot prevail if Fifth Third gives evidence of a legitimate, nondiscriminatory reason for the conduct and Johnson cannot show that such a reason is mere pretext.

B.

The FMLA makes it unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). We have said that Section 2615(a)(2) encompasses a retaliation theory. *Killian v. Yorozu Auto. Tenn. Inc.*, 454 F.3d 549, 555 (6th Cir. 2006). In order for Johnson to establish a *prima facie* case of retaliation, she must show:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Id.* at 556. Establishing a *prima facie* case in this context is "easily met." *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 501 (6th Cir. 2013). To show a causal connection, Johnson

"must produce sufficient evidence to support an inference" that Fifth Third acted because she engaged in the protected activity. *Ozier v. RTM Enters. of Ga., Inc.*, 229 F. App'x 371, 377 (6th Cir. 2007); *see also Taylor v. Bd. of Educ.*, 240 F. App'x 717, 720 (6th Cir. 2007). Johnson "bears the burden of demonstrating a causal connection." *Killian*, 454 F.3d at 556. We have said, however, that at the *prima facie* stage, "there may be circumstances where evidence of temporal proximity alone" is sufficient to establish a causal connection. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000); *see Herrera*, 545 F. App'x at 501 ("'Where an adverse employment action occurs very close in time after an employer learns of a protected activity,' such temporal proximity alone may satisfy the causal prong of a plaintiff's prima facie retaliation case." (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523–25 (6th Cir. 2008))).

The evidence shows that Johnson has established a *prima facie* case of FMLA retaliation. First, Johnson was engaging in a FMLA-protected activity when she mentioned her potential medical leave. Although Johnson did not provide extensive details about her surgery, did not know the exact date of the procedure or how long she would be out of work, and did not file any formal paperwork, taking leave for medical purposes is protected activity. *See* 29 U.S.C. § 2612(a)(1). Second, Fifth Third was sufficiently aware that Johnson was exercising her rights under the FMLA. Johnson told Engstrom about the surgery. As the direct supervisor for the personal bankers at the Fenton branch, Engstrom would have been well aware of medical leave policies. Although Johnson might not have provided enough information to trigger Engstrom's duties under the FMLA to provide specific information, it was surely enough to provide Engstrom notice of a protected activity for which Johnson could not be fired. Third, Johnson suffered a materially adverse employment action when she was fired. Fourth, Johnson has

shown temporal proximity between the time she informed Fifth Third of her surgery and her termination. Even if, as Fifth Third maintains, Johnson's surgery was not the cause of her termination, the fact that there were only a few weeks between Johnson's mention of her potential leave to Engstrom and her termination is sufficient to make a *prima facie* showing of a causal connection.

## C.

With this *prima facie* showing, the burden of production shifts to Fifth Third to provide a legitimate, nondiscriminatory reason for Johnson's termination. Fifth Third has provided ample evidence of such a reason by delineating Johnson's longstanding history of poor sales performance at the bank. This includes five separate Performance Counseling reports from 2011 through 2013, the testimony of multiple supervisors who documented Johnson's poor sales performance, and evidence that despite repeated counseling and coaching, Johnson did not consistently improve. There was also evidence—such as the meeting notes by Sissen and Polakoff—of the fragile nature of Johnson's employment due to her poor performance. Furthermore, Johnson does not dispute the evidence of her poor performance and does not contest Fifth Third's articulation of a legitimate, nondiscriminatory reason for her termination.

## D.

This shifts the burden back to Johnson to show that Fifth Third's proffered reason was pretext for FMLA retaliation. To show pretext, Johnson may establish either:

> (1) that the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not actually motivate the employer's action, or (3) that [it was] insufficient to motivate the employer's action.

*Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)). These three categories are a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the

employer fire the employee for the stated reason or not?" *Id.* (internal quotation marks omitted). To succeed, Johnson "must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

Other than her own personal beliefs, Johnson has provided no evidence of pretext that could create a genuine issue of fact as to Fifth Third's legitimate grounds for her termination. Johnson does not dispute her poor sales performance or the fact that she thought, on many occasions, that she might lose her job. Instead, she points to several other facts from which she argues the trier of fact could find that Fifth Third's reason was a pretext for a retaliatory termination. Because these various arguments for pretext lack support in both the record and our case law, her retaliation claim fails.

1.

Johnson asserts that Fifth Third's reason was "insufficient to motivate the employer's action." She alleges that Fifth Third terminated her in violation of an unwritten progressive-discipline policy that no employee could be terminated unless she had received a performance counseling report within the previous six months. She also alleges that she was treated "differently" after mentioning her bariatric surgery to Engstrom. With this, she argues that a question of fact exists as to whether Fifth Third violated its performance-counseling policies when firing her. As evidence, Johnson provides her own understanding of Fifth Third's performance-counseling policy from her time as a Financial Center Manager:

> [Y]ou had to be under 70 percent to goal three months in a row and then you would go on a performance counseling. Actually, you know, you would work with your employee first with an action plan, a performance action plan to try to help them move up. That would be your first step. Or actually, probably the first thing . . . would be a verbal, you know, it looks

> like we've got a little bit of issue here, we need to start working on some things. And sometimes that's all it takes.
>
> Then you go on a performance action plan. And then if things still don't improve after three months of 70 percent or less to goal, and I wouldn't wait until somebody was 70 percent or less to goal before I would start the other actions. And then when you move to a performance counseling after three months you're on a probationary period of six months, and if you, if things begin to improve then at six months you're off of that unless you hit another three months in a row of 70 percent less to goal.

Johnson believes that an employee could not be terminated without being on a performance action plan. She testified that Lucas told her this, a claim which Lucas denies. Because she was not on an action plan after July 2013, Johnson argues that she could not be terminated for poor performance in May 2014.

Although the existence of such a policy at Fifth Third could theoretically help Johnson in establishing pretext, she has not provided any evidence, other than her own understanding and recollection, that such a policy exists. By contrast, Fifth Third has produced the unequivocal language of its written employee discipline policy. Some of the language mirrors Johnson's recollection but the policy as a whole directly contradicts Johnson's assertions. The Performance Counseling policy in effect at the time of Johnson's termination stated, in relevant part:

> . . . The counseling process is not intended to be punitive or punishing, but is designed to redirect performance that fails to meet expectations. . . .
>
> The form or method of delivery counseling may vary depending upon the circumstances. Counseling may come in various forms, including but not limited to: [verbal coaching/counseling, written performance counseling] . . .
>
> Nothing contained in this policy, or in any other Fifth Third policy, should be construed to alter the at-will employment relationship or create a progressive policy or practice.

Additionally, each Performance Counseling report contains the specific language that "Fifth Third Bank is an at-will employer and either the employee or Fifth Third may terminate

employment at any time for any reason, with or without cause or notice." All written documentation of Fifth Third's employment policies indicate that employment was "at will" and that Performance Counseling was intended as a coaching and review mechanism, not a progressive-discipline policy that would prevent an employee from being fired. This was corroborated by testimony from Polakoff, Lucas, and Engstrom. In the face of such evidence, Johnson's accusation that Fifth Third violated unwritten employee policies, without more, is not enough to permit the claim to survive summary judgment.

2.

Johnson also argues that the timing of her termination is evidence of pretext because she was fired only two weeks after telling Engstrom about her upcoming surgery. It is well-established, however, that temporal proximity "is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc*, 272 F.3d at 317. We require "other, independent evidence" before we will consider suspicious timing as an indicator of pretext. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012).

Johnson relies on the circumstance of her termination, which despite a long history of performance problems did not occur until a few weeks after she mentioned potential medical leave, as independent evidence of pretext to support her temporal proximity argument. She looks to *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387 (6th Cir. 2005), to support this position. In *DeBoer*, we found pretext was established based, in part, on temporal proximity because "although [plaintiff's] performance evaluation indicating that she needed improvement occurred many months before she announced her pregnancy, [her employer] did not have a negative reaction to [her] allegedly poor supervisory skills until after she announced her

pregnancy." 124 F. App'x at 394. We were clear that the "additional evidence of pretext" came from the fact that the employer "did not appear to be troubled by [plaintiff's] supervisory skills until after she announced her pregnancy." *Id.*

Our holding in *DeBoer* is distinguishable from the facts of Johnson's case. Fifth Third has provided ample evidence—through the Performance Counseling reports and Johnson's meetings with employee-relations professionals—that they were "troubled" by Johnson's sub-par performance. Johnson fails to provide additional evidence to show that Fifth Third was unconcerned about her poor performance until she mentioned the need to take medical leave and concedes that she knew her job was in jeopardy before that time. The facts show a three-year cycle of poor performance, employee counseling, and multiple second chances, with no indication that Johnson would ever improve. Because Johnson has not offered any evidence beyond temporal proximity, she cannot show pretext on this basis.

3.

Finally, Johnson makes a number of arguments that Fifth Third used her performance reviews as pretext to fire her. These are also without merit. First, Johnson points to the fact that that Engstrom failed to provide her with FMLA paperwork. She argues that the failure to provide her with paperwork is evidence that Fifth Third's reason for firing her—her performance reviews—was merely pretext. Johnson cites to Department of Labor (DOL) regulations, which require an employer to provide an employee with certain information within five days of an employee requesting leave or an employer "acquir[ing] knowledge" that the employee's requested leave may qualify as FMLA leave. 29 C.F.R. § 825.300(b), (c). The DOL regulations, however, apply only when an employee requests leave. *Id.* Johnson never requested any leave. The undisputed facts show that Johnson was merely giving Engstrom a "heads up" and was not

formally requesting leave. Johnson did not even know the date of her surgery or any additional details, such as how much leave she would need.

Second, Johnson argues that Engstrom's inconsistent testimony about her upcoming leave is evidence of pretext. This argument is also unpersuasive. Johnson correctly notes that, in Engstrom's deposition, he initially testified that he had discussed Johnson's potential leave with Hotchkiss before Johnson was terminated. Engstrom later corrected his testimony following a brief break in the deposition, explaining that his discussion with Hotchkiss occurred after Johnson filed her lawsuit, rather than before her termination. At Hotchkiss's deposition, he corroborated Engstrom's corrected testimony. Such a change in testimony does not support a finding of pretext. Johnson's reliance on *Cichewicz v. UNOVA Industrial Automotive Systems, Inc.*, 92 F. App'x 215 (6th Cir. 2004), is misplaced. *Cichewicz* stands for the proposition that where an employer cannot get its story straight about the *reason for the termination itself* and continually changes its explanation, that fact can support a finding of pretext. 92 F. App'x at 220. *Cichewicz* is not applicable here because Fifth Third has not changed its reason for firing Johnson. The bank has consistently argued that Johnson was terminated because of her history of poor sales performance and an inability to consistently improve, despite employee counseling. In light of this record, we are not prepared to find evidence of pretext on the basis of an error made during deposition testimony about a fact that is only ancillary to the reason for termination.

Third, Johnson alleges that the fact that Lynch was given the opportunity to resign rather than be fired, is evidence of pretext and constitutes retaliation. Johnson relies on our decision in *Moore v. KUKA Welding Systems & Robot Corporation*, 171 F.3d 1073 (6th Cir. 1999). In *Moore*, we held that "the causal connection between the adverse employment action and the protected activity . . . may be established by demonstrating that the adverse action was taken

shortly after plaintiff filed the complaint and by showing *that he was treated differently from other employees*." *Moore*, 171 F.3d at 1080 (emphasis added). Such a holding is not applicable here. Although Johnson and Lynch were both personal bankers working in the same branch and subject to discipline around the same time, they were not similarly situated. Lynch, who had no history of performance problems or discipline, was given the chance to resign following a one-time mistake in judgment. Johnson was fired on the basis of a well-documented history of deficient performance and an inability to sustain improved performance after Fifth Third's extensive counseling and coaching. Without a similarly situated coworker, she cannot show that she was treated differently and cannot show evidence of pretext under *Moore*.

IV.

Under Michigan's ELCRA, "[a]n employer shall not . . . [f]ail to refuse to hire or recruit, *discharge*, or otherwise discriminate against an individual with respect to employment . . . because of religion, race, color, national origin, *age*, *sex*, height, weight, or marital status." M.C.L. § 37.2201(a)(1) (emphasis added).

Johnson alleges both age and gender discrimination under the ELCRA, but she provides only circumstantial evidence of discrimination. Therefore, we treat her age and gender claims as claims of disparate treatment and apply the *McDonnell Douglas* framework. *See Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 589 (6th Cir. 2014). To establish a *prima facie* case of either age or gender discrimination, Johnson must prove by a preponderance of the evidence that "(1) she [was] a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by someone outside the protected class or treated differently from similarly situated non-protected employees." *Id.*

A.

Even if we assume that Johnson has made out a *prima facie* case of age discrimination, Fifth Third has provided ample evidence of a legitimate, nondiscriminatory reason for her termination: her repeated inability to meet sales goals despite extensive employment counseling. This shifts the burden of production back to Johnson to show, by a preponderance of the evidence, that Fifth Third's reason was pretext for discriminatory conduct. *See Manzer*, 29 F.3d at 1084. The fact that Johnson was replaced by a younger employee after she was fired, alone, is not sufficient to show pretext. Without any additional evidence, Johnson's age discrimination claim fails.

B.

Similarly, even assuming that Johnson could make out a *prima facie* case of gender discrimination, Johnson's claim still fails. Fifth Third provided more than sufficient evidence of a legitimate reason for firing Johnson and therefore the burden rests with Johnson to show that the reason for firing her was pretext for gender discrimination. Johnson is unable to do so. She has not provided any evidence that her termination was motivated by her gender. Evidence that a male employee was given the opportunity to resign for an unrelated disciplinary reason, without more, does not establish pretext. As a result, Johnson's claim of gender discrimination would still fail.

V.

For the reasons started above, we affirm the judgment of the district court.